U.S. DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

**FILED**

SEP 1 5 2015

IN OPEN COURT
JAMES W. McCORMACK, CLERK
BY:_____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 4:15-CR-234-DPM |
| | ) | |
| PHILLIP W. CARTER | ) | |
| | ) | |

### INFORMATION

The United States charges that, at all times material to this Information:

### GENERAL ALLEGATIONS

1.      The Arkansas Department of Human Services (ADHS) was an agency of the government of the State of Arkansas.   ADHS was Arkansas' largest state agency, with more than 7,500 employees and a budget of approximately $6.8 billion.   Among other things, ADHS worked with a system of community mental health care centers to provide mental health services to adults, juveniles, and children.

2.      In each of the calendar years of 2007, 2008, 2009, 2010, and 2011, ADHS received over $10,000 in federal funding.

3.      PERSON A was a resident of Crittenden County, Arkansas.   PERSON A was the Pastor and Superintendent of a church located in West Memphis, Arkansas.

4.      Defendant PHILLIP W. CARTER was a resident of Crittenden County, Arkansas. CARTER was a juvenile probation officer in Crittenden County and city councilmember for West Memphis, Arkansas.   CARTER was also affiliated with PERSON A's church.

5.    STEVEN B. JONES was a resident of Crittenden County, Arkansas.   JONES was a Deputy Director of ADHS from in or about April 2007 to in or about July 2013.   Prior to becoming Deputy Director of ADHS, JONES served in the Arkansas House of Representatives from in or about November 1998 to in or about December 2004.   JONES represented District 54, which included most of Crittenden County.

6.    As an employee and high-ranking manager, JONES was an agent of ADHS, and he was responsible for, among other things, overseeing five of ADHS's ten divisions.

7.    PERSON C was the owner of two mental health companies, COMPANY A and COMPANY B.

8.    COMPANY A provided outpatient mental health services to juveniles.

9.    COMPANY B provided inpatient mental health services to juveniles.

## COUNT ONE
### Conspiracy
### (Violation of 18 U.S.C. § 371)

10.    The introductory allegations set forth in paragraphs 1 through 9 are realleged and incorporated by reference as though fully set forth herein.

### The Conspiracy

11.    Beginning in or about April 2007, and continuing through in or about November 2011, in the Eastern District of Arkansas, and elsewhere, the defendant, PHILLIP W. CARTER, together with JONES, PERSON A, and PERSON C, and others known and unknown, did knowingly and unlawfully conspire, confederate, and agree together and with each other:

a.    to corruptly solicit and demand for the benefit of any person, and accept and agree to accept, anything of value from any person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of $5,000 or more of ADHS, an agency of the State of Arkansas, in violation of 18 U.S.C. § 666(a)(1)(B);

b.    to corruptly give, offer, and agree to give, something of value to any person, intending to influence and reward an agent of ADHS, an agency of the State of Arkansas, in connection with a business, transaction, and series of transactions of $5,000 or more of ADHS, an agency of the State of Arkansas, in violation of 18 U.S.C. 666(a)(2);

c.    to devise and intend to devise a scheme and artifice to defraud and deprive the citizens of the State of Arkansas of their right to the honest and faithful services of its public officials, through bribery and the concealment of material information, in violation of 18 U.S.C. §§ 1343 and 1346.

## Objects of the Conspiracy

12.    It was an object of the conspiracy for CARTER, JONES, PERSON A, PERSON C, and others to enrich themselves and COMPANY A and COMPANY B, and to advance COMPANY A and COMPANY B's business interests, by providing cash payments and other things of value to JONES, in exchange for JONES agreeing to take official action to benefit PERSON C, COMPANY A, and COMPANY B.

13.    It was an object of the conspiracy to hide, conceal, and cover up the nature and scope of JONES' dealings with CARTER, PERSON A, and PERSON C, including the true source and nature of the payments and other things of value provided to JONES.

-3-

**Manner and Means**

14.     The conspiracy was carried out through the following manner and means, among others:

a.     JONES solicited and received things of value, including cash payments, from PERSON C.

b.     PERSON C provided things of value to JONES, through the use of intermediaries, CARTER and PERSON A.

c.     In return for cash payments and other things of value, JONES agreed to perform official acts for the benefit of PERSON C, COMPANY A, and COMPANY B.

d.     CARTER, JONES, and PERSON C hid, concealed, and covered up their activity and dealings by holding periodic meetings at restaurants in Memphis, Tennessee or rural Arkansas so they would not be easily recognized.  At the meetings, they discussed the business interests of PERSON C, COMPANY A, and COMPANY B, and JONES agreed to take official acts to benefit PERSON C, COMPANY A, and COMPANY B, including providing internal ADHS information to PERSON C.

e.     Prior to or during the meetings among CARTER, JONES, and PERSON C, PERSON C would provide CARTER with checks from companies associated with PERSON C that were made payable to PERSON A's church.  After the restaurant meetings, CARTER would provide the checks to PERSON A, who typically deposited the checks or caused the checks to be deposited into church-related checking accounts (including an account associated with the church's child development center) and received cash in return—either directly from the church-related accounts or after transferring the money from the church-related accounts to a

-4-

personal checking account. PERSON A would then provide CARTER with all or part of the cash, and CARTER would, in turn, provide all or part of the cash payment to JONES during a subsequent, in-person meeting between JONES and CARTER.

      f.     JONES and PERSON C used CARTER as an intermediary to relay messages, schedule meetings, and deliver bribe payments from PERSON C to JONES.

      g.     CARTER, JONES, PERSON A, and PERSON C frequently spoke in basic code when talking to each other on the telephone and refrained from using the names of other participants in the conspiracy.

      h.     CARTER, JONES, PERSON A, PERSON C, and others hid, concealed, and covered up their dealings and activity by using bank accounts associated with PERSON A's church, and on some occasions PERSON A's accounts, to funnel bribe payments to JONES. The transmission of the funds that were paid by PERSON C to JONES, with the assistance of CARTER and PERSON A, occurred through the use of interstate wire communications.

## Overt Acts

15.     In furtherance of the conspiracy, and to effect its objects and purposes, CARTER, JONES, PERSON A, PERSON C, and others committed the following overt acts, among others, in the Eastern District of Arkansas and elsewhere:

16.     On or about August 3, 2011, during a recorded telephone conversation between JONES and CARTER, JONES provided information to CARTER regarding reports JONES had received in internal ADHS monitoring meetings concerning COMPANY A and COMPANY B.

-5-

17.     On or about August 3, 2011, during the same recorded telephone conversation, CARTER told JONES that PERSON C wanted to meet with JONES to discuss concerns about a referral process that PERSON C believed was disadvantageous to PERSON C's businesses.

18.     On or about August 3, 2011, during the same recorded telephone conversation, JONES and CARTER continued to discuss scheduling a meeting with PERSON C, with JONES suggesting that they meet in Brinkley, Arkansas "like we did that time." CARTER told JONES he would call PERSON C and discuss scheduling the meeting. JONES then agreed to provide information concerning internal reports about PERSON C and about a referral program in place at ADHS, stating: "I get you up to speed with what's going on, you know, some of the stuff that's been said [about PERSON C] . . . Just let [PERSON C] know we still trying to look out on the inside, but I did not know about the referral thing changing. . . . [UI] So, we'll see if I can find out what's going on with that."

19.     On or about September 11, 2011, during the surveilled meeting at the restaurant in Memphis, Tennessee, PERSON C discussed a business issue that PERSON C was concerned about. PERSON C also handed CARTER a $2,000 check after JONES temporarily left the dinner table. CARTER placed the check in his sock.

20.     On or about September 11, 2011, during the surveilled meeting at the restaurant in Memphis, Tennessee, CARTER briefly left PERSON C and JONES at the dinner table by themselves. CARTER then used a cellular telephone to call PERSON A and notify PERSON A that CARTER had received a check from PERSON C. CARTER told PERSON A it was going to be a "great day."

-6-

21.     On or about September 11, 2011, during a recorded telephone conversation after

the restaurant meeting, CARTER called JONES and asked JONES: "Can you roll that

information over in your head real quick and let's come back to the table next weekend?"

JONES replied, "You know I can."   JONES and CARTER then had the following exchange:

CARTER:     Alright.   That's what we need to do.

JONES:      Ok.

CARTER:     But [PERSON C's] adamant.   [PERSON C] wants to know where you are on it.
            And, you know, what's the pros and cons?

JONES:      Yeah, let me just, let me just weigh it and make sure that it's cool.   Because I
            know internally we have lots of discussions when those types of issues come up,
            so . . . .

CARTER:     Right.

JONES:      Let me think it through for a minute and I'll get back with you.

CARTER:     Ok.  Ok.  Alright.  I appreciate you man.

    All in violation of Title 18, United States Code, § 371.

RAYMOND N. HULSER
Chief

*Sulliva*

EDWARD P. SULLIVAN (NY #2731032)
LAUREN BELL (OH #0084662)
GWENDOLYN A. STAMPER (NY #5050224)
Trial Attorneys
Public Integrity Section
Criminal Division
U.S. Department of Justice
1400 New York Ave., N.W., 12th Floor
Washington, D.C. 20530
Tel:   (202) 514-1412
Fax:   (202) 514-3003
edward.sullivan@usdoj.gov
lauren.bell2@usdoj.gov
gwendolyn.stamper@usdoj.gov